J-A10014-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :      PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| | : |
| CODY TYLER PEARSALL | : |
| | : |
| Appellant | : No. 1502 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 29, 2025
In the Court of Common Pleas of Wayne County Criminal Division at
No(s): CP-64-CR-0000082-2024

BEFORE: STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:        **FILED JULY 28, 2026**

Appellant, Cody Tyler Pearsall, appeals from the judgment of sentence entered in the Court of Common Pleas of Wayne County after the trial court, sitting as finder of fact in his non-jury trial, found him guilty of one count of Child Pornography[1] and one Count of Criminal Use of a Communication Facility.[2] Herein, he challenges the trial court's denial of his pretrial motion to suppress both incriminating evidence obtained from his cellphone and statements made to police during what he contends was a custodial interrogation. We affirm.

The trial court sets forth the pertinent facts and procedural history:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6312(D) (F3).
[2] 18 Pa.C.S.A. § 7512(A) (F3).

On February 25, 2025, Defendant[, Cody Pearsall] was found guilty on one count of Child Pornography and one count of Criminal Use of a Communication Facility at a Non-Jury Trial. [On May 29, 2025, the trial court sentenced him to three to 23 ½ months in the Wayne County Correctional Facility.] Pearsall filed a Notice of Appeal on June 11, 2025.

The action stems from the execution of a search warrant on December 27, 2023, at [the Salem Township, Wayne County, Pennsylvania home in which Pearsall and others were residing.] The search warrant was part of a separate investigation and granted law enforcement the authority to seize digital devices from all residents in the home.

Pearsall was not the subject of the separate investigation but resided in the home and was present when officers executed the search warrant. Upon being asked if he had ever seen Child Sexual Abuse Materials (CSAM), Pearsall revealed that he had. Investigators seized his devices and, upon examination of the data extraction, located five image files depicting CSAM. A Complaint was filed on March 13, 2024, and the Criminal Information charging Pearsall with two counts of child pornography and one count of criminal use of a communication facility was filed on March 15, 2024.

Pearsall filed an Omnibus Pre-Trial Motion on August 21, 2024, in which he sought to suppress the statements he made to law enforcement and the evidence seized during execution of the search warrant. Pearsall argued that, since he did not receive *Miranda* warnings, the statements he gave and any evidence relating to them should be suppressed. Additionally, Pearsall sought the suppression of evidence seized during the execution of the search warrant, arguing that the warrant was legally deficient for not specifically naming [him] and for not specifically targeting his cell phone. Pearsall also sought suppression of the evidence from the contents of his phone, arguing that law enforcement had never obtained a search warrant to specifically search the contents of his phone.

Testimony was heard on both October 2 and October 18, 2024, and after reviewing the parties' briefs, the [trial court] issued an Order on December 4, 2024, denying Pearsall's Omnibus Pre-Trial Motion.

- 2 -

Trial Court's "Statement of Reasons," 7/28/25, at 1-2.

Pearsall presents the following questions for this Court's consideration:

1. Whether the Trial Court erred when it held the search warrant used to seize evidence from Appellant's cellphone was valid?

2. Whether the Trial Court erred when it held Appellant's statements to police were not made during a custodial interrogation and the failure of police to Mirandize Appellant beforehand did not subject these statements to suppression?

Brief of Appellant, "Statement of Questions Involved," at 5.

Our standard of review for an order denying a motion to suppress is well-established.

[We are] limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, "whose duty it is to determine if the suppression court properly applied the law to the facts." Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. Ross*, 330 A.3d 1262, 1267 (Pa. Super. 2025) (quoting

*Commonwealth v. Mbewe*, 203 A.3d 983, 986 (Pa. Super. 2019)).

Pearsall's first issue challenges the constitutional validity of the search warrant authorizing the seizure of his cellphone and all electronic devices[3] in the residence, when neither the "Application for Search Warrant" nor the accompanying 16-page "Affidavit of Probable Cause" so much as listed his name. Instead, only the name of Pearsall's half-brother, Christopher Foster, appears where the "Application for Search Warrant" asks, "Name of Owner, Occupant or Possessor of Said Premises To Be Searched." Brief of Appellant at 9. As such, he submits that only the search and seizure of Christopher Foster and his devices was permissible.

All individuals have a constitutional right to be free from unreasonable searches and seizures by the police. The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

Additionally, Article I, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no

---

[3] The search warrant authorized all computer, hardware, and software, including but not limited to any equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. N.T. at 14.

warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. Art. I § 8.

Under both provisions, search warrants must "specifically list the things to be seized." *Commonwealth v. Grossman*, 555 A.2d 896, 899 (Pa. 1989) (citation omitted). Under Article I, Section 8, that description must be "as particular as reasonably possible." *Id.* "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left [to] the discretion of the officer executing the warrant." *Id.* (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

> [S]earch warrants should be read in a common sense fashion and should not be invalidated by hypertechnical interpretations. This may mean, for instance, that when an exact description of a particular item is not possible, a generic description will suffice. In that vein, we have held that where the items to be seized are as precisely identified as the nature of the activity permits and an exact description is virtually impossible, the searching officer is only required to describe the general class of the item he is seeking.

*Green*, 265 A.3d at 550 (quotations and citations omitted).

An overbreadth analysis involves first determining "for what items probable cause existed" and then measuring the "sufficiency of the description against those items." *Grossman*, 555 A.2d at 900. Suppression is required if there is an "unreasonable discrepancy" between the items for which there

is probable cause and the description of the items the warrant authorizes police to seize. *Id.*; *see Commonwealth v. Johnson*, 240 A.3d 575, 584–85 (Pa. 2020). In Pennsylvania, the same overbreadth standard applies to a search of a digital device as for a physical space. *Commonwealth v. Green*, 265 A.3d 541, 553–54 (Pa. 2021) (holding a search warrant is overbroad if it authorizes police to search for and seize items without establishing probable cause to search for and seize those items).

Pearsall presents the overbreadth argument that if we were to adopt the Commonwealth's present position that both the Application for Search Warrant and the warrant itself supported troopers' search of him and his devices, then "the State Police could apply for a search warrant based on suspected criminal activity of a single individual residing in a residence with ninety-nine other people, each of whom [has] their own personal cell phone in their possession[,]" and search every one of those persons and their devices. Brief of Appellant, at 19.

He continues,

Under the Commonwealth's theory, the agents of the government could then enter the said residence with guns drawn, detain all one hundred people, seize all one hundred cell phones, and search and delve into the personal details of all of the other ninety-nine innocent individuals who happened to be caught up in the government's operation. Such outcome cannot be the intention of the Founding Fathers when the Fourth Amendment of the U.S. Constitution was drafted, nor the intention of the founders of Pennsylvania when the Commonwealth's Constitution was created.

Brief of Appellant, at 10.

- 6 -

Pearsall argues that to uphold the warrant in this case would be tantamount to endorsing prohibited "general warrants" that neither describe with specificity the items to be seized nor articulate the existence of probable cause to believe such items will provide evidence of criminal activity. Brief of Appellant at 11, *citing* **Green**, 265 A.3d at 549 and **Commonwealth v. Young**, 287 A.3d 907, 919 (Pa. Super. 2022). Because this cannot be, he submits, he asks this Court to find that the warrant was not sufficiently particular to support a search and seizure of him and his device.

The Commonwealth counters that the search warrant validly and properly encompassed the search and seizure of all residents' digital devices, including Pearsall's digital device that ultimately was found to contain Child Pornographic Images contained therein. Testifying at the suppression hearing was Pennsylvania State Trooper Gabriel Paddock, who was assigned to the Bureau of Criminal Investigations, Northeast Computer Crime Unit. Trooper Paddock explained that the search warrant he executed in the present matter encompassed all the digital devices at the residence because in his experience, most suspected possessors and traffickers of child pornography use an email address or a screen name with a different name or use devices that are not in their names:

| **Prosecutor:** | Now, you stated that this, Mr. Foster was the primary suspect, could you explain to the Judge why you would get a search warrant for all the digital devices at the residence rather than just Mr. Foster's? |
|---|---|

**Trooper Paddock:** Yes. So, during these investigations related to the sexual abuse of children, also known as child pornography, most suspects use an email address or a screen name with a different name, not many people use their true identity which would make sense because why would you want other people to know who you are when you're engaging in illegal activities. So, in a case like this, the screen name or email address may be Chris Foster but there's, it could be anyone else in the residence.

. . .

**Prosecutor:** And when you left with Mr. Foster, now did he ride in the car with you? How did he get to P.S.P.?

**Trooper Paddock:** No, he drove in his own vehicle.

**Prosecutor:** Okay. So, he [Foster] was not in custody at that time?

**Trooper Paddock:** He was not, and he was advised of that as well as everybody else that no one is under arrest that this is a search warrant.

N.T. at 7-8. Trooper Paddock stated that investigators performed an onsite examination of everyone's digital devices and immediately returned those devices confirmed to contain nothing suspicious. N.T. at 8.

To support the constitutionality of this approach, the Commonwealth draws a parallel between the present facts and those in **Green**, in which the Pennsylvania Supreme Court held that in cases involving child pornography, a warrant that authorizes law enforcement personnel to seize and search a wide array of electronic devices and associated hardware, etc., is not overbroad where "self-limiting language" narrows a search only for evidence

relating to the possession and/or distribution of child pornography. ***Green***, 265 A.3d at 552. ***See also Commonwealth v. Yeuris Almonte-Sena***, (non-precedential decision) 746 MDA 2025, 2026 WL 1693792 at *7, fn.6 (Pa. Super. filed June 11, 2026) (rejecting appellant's argument that, *inter alia*, self-limiting language was lacking where the application for a search warrant limited the scope of the search to evidence of the crime of possession and/or dissemination of child pornography).

Specifically, the warrant in ***Green*** stated, "These items will be seized and then later searched for evidence relating to the production and/or distribution of child pornography." ***Id***. at 546 (emphasis removed). Defendant Green argued that the search warrant "was overbroad due to the disparity between the immense number of items requested to be seized and later searched, and the underlying probable cause offered to support the warrant." ***Id***. at 549. He also maintained that the search warrant "was overbroad in that the language used to particularize the search did nothing to curtail law enforcement from searching each and every file on the seized devices." ***Id***.

Most relevant for our purposes is the ***Green*** majority's discussion of the first issue addressing the scope of the search and seizure of the physical items (computers, cell phones, and other electronic devices) within Defendant Green's home. Green argued that probable cause existed to support a search and seizure of only his phone and computer, making the warrant overbroad when it included what he said was "every digital device found at [his] address

capable of accessing the internet, as well as all peripheral devices, software, etc., **with no restriction on ownership whatsoever**.”  *Green* at 551 (emphasis added).

The Supreme Court disagreed and found that authorities had probable cause to search and seize all digital devices in Green's home, such that the warrant was not overbroad when it encompassed more than merely his personal phone and computer.  The majority explained this was because there was no way for authorities, prior to the search, to obtain sufficient information of particular devices or particular users:

> [The] investigation in this case led [authorities] to an IP address being used by an unknown device to share child pornography. The owner of the IP address, Comcast, subsequently responded to a court order, identified [Green] as the subscriber of that IP address, and provided [his] residential address associated with that subscription.
>
> With that information, the warrant explained:  “Based on the facts set forth in this affidavit, I believe that probable cause exists to believe that a user of the computer utilizing an internet account with a service address of [Green's residential address], was sharing child pornography on the BitTorrent network.”  Affidavit of Probable Cause at ¶ 24.  **The warrant did not request to search a particular device or even name a particular user because there was no way for investigators to obtain that information prior to a search.**

*Green* at 552, (Brackets in original) (emphasis added).

Similarly, in the case *sub judice*, Trooper Paddock explained on the witness stand that it was not possible to isolate a single electronic device and associate it with a particular user.  Under these facts, we conclude that the search warrant and the affidavit were both sufficiently particular and self-

limiting to the extent it provided the troopers with probable cause to conduct only a search of those electronic devices at the residential address that could contain child pornography. As the evidence adduced at the suppression hearing established that the search was so limited, we discern no merit to Pearsall's first issue.

Next, Pearsall argues the trial court erred when it held that his statements to police were not made during a custodial interrogation so that the failure of police to Mirandize him beforehand did not subject his statements to suppression.

Piersall argues that Pennsylvania State Police Corporal Christopher Hill's interrogation of him, as described *supra*, was custodial under Pennsylvania law because a reasonable person in his position would not have felt free to leave, and therefore ***Miranda***[4] warnings were required at the onset of the questioning put to him. ***See*** Brief of Appellant at 17.

Our law is clear that when an individual is in custody and subject to interrogation, that individual is entitled to ***Miranda*** warnings. ***Commonwealth v. Phillips***, 327 A.3d 1236, 1242 (Pa. Super. 2024). "An individual is in custody if he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation."

---

[4] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

***Commonwealth v. Cooley***, 118 A.3d 370, 376 (Pa. 2015) (citation and internal quotation marks omitted). The following standard applies:

> [t]he standard for determining whether an encounter with the police is deemed "custodial" or police have initiated a custodial interrogation is an objective one based on a totality of the circumstances, with due consideration given to the reasonable impression conveyed to the person interrogated. Custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." "Interrogation" is police conduct "calculated to, expected to, or likely to evoke admission."

***Commonwealth v. Seeney***, 316 A.3d 645, 649 (Pa. Super. 2024) (citing ***Commonwealth v. Mannion***, 725 A.2d 196, 200 (Pa. Super. 1999)).

This issue turns largely on the trial court's credibility determination that Corporal Hill and Trooper Paddock credibly testified that they informed Pearsall and most of the others that they were free to leave at any time they wished. Specifically, Trooper Paddock acknowledged that fourteen law enforcement officers arrived at the property at 6:00 a.m. to serve and carry out the search warrant, but he explained the large number was chosen not to detain the occupants of the home but for the protection of the law enforcement officers serving and executing the search warrant, because their information was that eight (8) persons were occupying the home in question.

Trooper Paddock testified, "I explained to the residents on the front porch, we were executing a search warrant, no one was under arrest, everyone is free to leave, the residents did move about freely in that home while we were there." N.T. at 18. No one ever told the residents that they

were not free to leave, he testified. N.T. at 17. He admitted that the property was surrounded "to the best of our ability," N.T. at 17, but he explained that he was acting pursuant to "a search warrant" and that "nobody is under arrest during a search warrant." N.T. at 17.

Trooper Paddock testified that he left the residence at approximately 45 minutes into the search, or roughly 6:45 a.m., but the other law enforcement personnel did not complete the search until approximately 10:35 a.m., or about four and one-half hours after they first arrived. N.T. at 18. When asked, again, if people were free to leave in that four-hour period, Trooper Paddock answered, "Absolutely. Mr. Foster did." N.T. at 18. Defense counsel asked if Mr. Pearsall was free to leave during this time, and Trooper Paddock said he could have left as well. N.T at 18.

Chief Detective Peter Hower of the Wayne County District Attorney's Office testified he was present during the execution of the search warrant and assumed supervisory responsibilities with Corporal Hill from the Pennsylvania State Police once Trooper Paddock departed. N.T. at 22. He reiterated that once the house was secure and the search was underway, the occupants were free to leave; they were not in custody. N.T. at 23. "The only thing we were looking for is to make sure they didn't interfere with the search or didn't retrieve any weapons, but they were free to go. N.T. at 23. Chief Detective Hower confirmed that they completed their search and left the area at 10:34 a.m. N.T. at 23.

On cross-examination, Chief Detective Hower did not recall anyone stating they wished to get in their car and drive off the premises. N.T. at 27. He testified that he would have permitted them to do so if they asked. N.T. at 27. When confronted with the suggestion that persons were not freely permitted to use the bathroom, the chief detective replied that they were permitted but an escort would have been necessary to check the bathroom or the bedroom for weapons before they could enter those rooms. N.T. at 27-28.

Chief Detective Hower also opposed defense counsel's suggestion that it was absurd to say the residents could have chosen to leave—"They're told they're free to leave but with people having guns pointed at them?"—by first denying that anyone had a gun pointed at them and then clarifying that while the initial number of officers may have been 14, some were posted inside, some outside, and after the first hour or so, when the house was secure, a number of them left. N.T. at 28. The reason for the initial number was because there were eight residents, he explained. N.T. at 28.

On this issue, the trial court reviewed the testimony and opined that the authorities executing the search warrant did not restrain Pearsall, deprive him of his freedom of action in any significant way, or place him under arrest, such that he cannot reasonably claim to have been subjected to a custodial interrogation:

> Here, [Pearsall] admitted to watching child sexual abuse materials (CSAM) to Corporal Christopher Hill when Corporal Hill asked about his electronic devices and if he had ever seen any CSAM.

- 14 -

Previously, Corporal Hill testified that the residents, including Pearsall, would have been told that law enforcement was executing a search warrant for electronic devices and that anyone was free to leave and come and go as they please. Trooper Gabriel Paddock testified that he told "the residents on the front porch, we were executing a search warrant, no one was under arrest, everyone is free to leave, the residents did move freely in that home while we were there." N.T. (Day 1) at 17-18.

Detective Peter [Hower] testified that "the only thing we were looking for is to make sure they didn't interfere with the search or didn't retrieve any weapons, but they were free to go." *Id*. at 23. Detective [Hower]further testified that the only time they would have restricted any resident's movements were if "somebody had to retrieve something from a room or go to the bathroom, we would just escort them to the area and make sure they weren't getting any weapons, but they were free to leave . . . ." **Id**. at 25. Additionally, Detective [Hower] testified that there were initially fourteen (14) officers on scene because it was believed there were up to eight (8) people in the residence. However, once the initial search was done, two uniformed officers left and others were outside doing things with the devices, "so . . . there were not fourteen people hovering over these people." Id. at 28-29.

Defendant [Pearsall] testified that "there were many, many, many guys out there," and that they "all had weapons." Notes of Testimony (Day 2) at 64. While [Pearsall] testified that he did not hear police tell them they were free to leave, [he] was never put under arrest. N.T. at 65. Pearsall testified that he and his family were escorted into the living room/kitchen area, and that "there were people blocking the doors to the exits. Not really blocking it as in holding a gun making sure we don't leave, but they were standing there with their hands on their armor like this . . ." N.T. at 66-67. Pearsall described being escorted to the bathroom and back to the living kitchen area "where I assumed that's where they wanted me to be." N.T. at 68. "They told me to sit there, and I listened because of how just intimidating they were." N.T. at 68.

While Pearsall may have subjectively felt intimidated by police presence, this alone is not enough to conclude that [he] was subject to custodial interrogation.

. . .

[Pearsall] was not placed in a situation in which he was physically deprived of his freedom in any significant way, nor could he have had the reasonable impression that his freedom of action or movement was restricted considering Trooper Paddock told him he was free to leave. Since execution of the search warrant did not otherwise deprive Pearsall of his freedom of action in any significant way, he was not restrained and was not placed under arrest, [he] cannot be said to have been subject to custodial interrogation. The information gleaned from Pearsall's interactions with law enforcement were gratuitous and not subject to suppression for lack of warnings. Since Pearsall was not subject to custodial interrogation when he made an incriminating statement to law enforcement, and law enforcement had no obligation to Mirandize him, [the trial court] . . . denied his Motion to Suppress.

Trial Court Opinion at 8.

Our review of the record finds ample support for the trial court's determination that Corporal Hill, Trooper Paddock, and Detective Hower credibly testified that Pearsall and the others were repeatedly told they were free to leave the residence during the execution of the search warrant, such that they were not subjected to a custodial interrogation requiring a reading of their *Miranda* rights. Accordingly, we discern no basis upon which to disturb the trial court's order denying Pearsall's Motion to Suppress.

We affirm.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/28/2026

- 16 -